**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| DAN HAMMANN, Individually and as Representative of the Estate of, OLIVIA HAMMANN, Deceased, Plaintiff, | |
| v. | Case No. |
| ABBOTT LABORATORIES Defendant. | **AMENDED COMPLAINT AT LAW** **JURY TRIAL DEMANDED** |

Plaintiff, DAN HAMMANN, individually and as representative of the estate of, OLIVIA HAMMANN, deceased, (hereinafter "Olivia"), by and through the undersigned attorneys, brings this Complaint and demand for jury against ABBOTT LABORATORIES ("Defendant"). Upon information, belief and investigation of counsel to date, Plaintiff sets forth the following:

## INTRODUCTION

1. This action arises out of the death of a four-week old baby, who spent the majority of her four weeks fighting a deadly intestinal disease caused by Defendant's cow's milk-based infant formula and/or fortifier. Necrotizing Enterocolitis ("NEC"), is a life-threatening intestinal disease characterized by inflammation and injury of the gut wall barrier that may advance to necrosis and perforation of the gut. NEC largely affects low birthweight babies who are fed cow's milk-based infant formula and/or fortifiers. Olivia Hammann, a premature born, low birthweight baby, was fed *Similac Alimentum*, and developed NEC shortly thereafter. Plaintiff, Dan Hammann, brings this cause of action against Defendants for claims arising from the direct and proximate result of Defendant's negligence, willful and wrongful conduct in correlation to the development, manufacture, design, testing, packaging, labeling, marketing, distribution of the product known as *Similac Alimentum* (hereinafter referred to as "Product").

## PARTIES

2. At all times relevant hereto, Olivia Hammann was a resident of the State of Colorado.

3. Olivia was born on February 2, 1994 and died on March 3, 1994.

4. Plaintiff, Dan Hammann, was the father of Olivia and brings this action individually and as personal representative of the estate of Olivia Hammann, deceased.

5. Olivia left surviving the following next-of-kin:

    a. Marilu Hammann (mother);

    b. Dan Hammann (father);

    c. Alyssa Hammann (sister); and

    d. Aaron Hammann (brother).

6. Defendant is a corporation, incorporated under the laws of the State of Illinois. Defendant's principal place of business is Chicago, Illinois.

7. At all times relevant hereto, Defendant was authorized to conduct business and does conduct business in the State of Colorado.

## JURISDICTION AND VENUE

1. This is an action for damages which exceeds the sum of $75,000.00, exclusive of costs, interest, and attorneys' fees.

2. This Court has jurisdiction over this case pursuant to 28 U.S.C. §1332, as complete diversity exists between Plaintiff and Defendant, and the matter in controversy, exclusive of interest and costs, exceeds the sum or value of $75,000.00.

3. This Court has personal jurisdiction over Defendant because Defendant is authorized to conduct business and does conduct business in the State of Illinois. Defendant has

marketed, promoted, distributed, and/or sold its Product in the State of Illinois and Defendant has sufficient minimum contacts with this state and/or sufficiently avail themselves of the markets in the state through its promotion, sales, distribution, and marketing within this state to render exercise of jurisdiction by this Court permissible.

4. Venue of this action is proper in this Court pursuant to 28 U.S.C. §§1391(a) and (b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this judicial district. Further, venue is proper under 18 U.S.C. §1965(a) because Defendant transacts substantial business in this District.

## BACKGROUND

### I. The Science and Scope of the Problem

5. In the recent years, research has confirmed meaningful connections between cow's milk-based products, NEC and death in premature infants.

6. Around 1990, a prospective, multicenter study on 926 preterm infants found that NEC was 6 to 10 times more common in exclusively formula-fed babies than in breast milk fed and 3 times more common than in those who received formula plus breast milk. Babies born at more than 30 weeks gestation established that NEC was rare in those whose diet included breast milk, but it was 20 times more common in those fed exclusively formula. A. Lucas, T. Cole, *Breast Milk and Neonatal Necrotizing Enterocolitis*, LANCET, 336: 1519-1523 (1990) (emphasis added).

7. A study published in 2010 evaluated the health benefits of an exclusively human milk-based diet as compared to a diet with both human milk and cow's milk-based products in extremely premature infants. The results show that preterm babies fed solely human milk were 90% less likely to develop surgical NEC as compared to a diet that included some cow's milk-

3

based products. S. Sullivan, *et al*, *An Exclusively Human Milk-Based Diet Is Associated with a Lower Rate of Necrotizing Enterocolitis than a Diet of Human Milk and Bovine Milk-Based Products*, JOURNAL OF PEDIATRICS, 156: 562-7 (2010).

8. In 2011, the Surgeon General published a report warning that "for vulnerable premature infants, formula feeding is associated with higher rates of necrotizing enterocolitis (NEC)." U.S. Dep't of Health & Human Serv., Off. of Surgeon Gen., "The Surgeon General's Call to Action to Support Breastfeeding," Pg. 1 (2011). In same, it was stated that premature infants who are not breast-fed are 138% more likely to develop NEC. *Id* at pg. 2.

9. In 2012, the American Academy of Pediatrics issued a policy statement that all premature infants should be fed an exclusive human milk diet due to the risk of NEC. The Academy stated that "[t]he potent benefits of human milk are such that all preterm infants should receive human milk... If the mother's own milk is unavailable ...pasteurized donor milk should be used." *Breastfeeding and the Use of Human Milk*, PEDIATRICS, 129:e827-e84l (2012).

10. In 2013, a study reported the first randomized trial in extremely premature infants of exclusive human milk versus preterm cow's milk-based formula. The study found a significantly higher rate of surgical NEC in infants receiving the cow's milk-based preterm formula. The study further supported the use of exclusive human milk diets to nourish extremely preterm infants. E.A. Cristofalo, *et al*, *Randomized Trial in Extremely Preterm Infants*, J PEDIATR., 163(6):1592-1595 (2013).

11. A report published in 2014 described NEC as "a devastating disease of premature infants and associated with significant morbidity and mortality. While the pathogenesis of NEC remains incompletely understood, it is well established that the risk is increased by the administration of infant formula and decreased by the administration of breast milk." Misty Good,

*et al.*, *Evidence Based Feeding Strategies Before and After the Development of Necrotizing Enterocolitis*, Expert Rev. Clin. Immunol., 10(7): 875-884 (2014). The same study found that NEC "is the most frequent and lethal gastrointestinal disorder affecting preterm infants and is characterized by intestinal barrier disruption leading to intestinal necrosis, multi-system organ failure and death." *Id.* The study noted that "NEC affects 7-12% of preterm infants weighing less than 1500 grams, and the frequency of disease appears to be either stable or rising in several studies." *Id.* "The typical patient who develops NEC is a premature infant who displays a rapid progression from mild feeding intolerance to systemic sepsis, and up to 30% of infants will die from this disease." *Id.* Advances in formula development have made it possible to prevent necrotizing enterocolitis, and the "exclusive use of human breast milk is recommended for all preterm infants and is associated with a significant decrease in the incidence of NEC." *Id.*

12. In 2017, a publication by the American Society for Nutrition, noted that human milk has "been acknowledged as the best source of nutrition for preterm infants and those at risk for NEC." The study compared the results from two randomized clinical trials on preterm infants with severely low weight (between 500 and 1250 grams at birth) and compared the effect of cow's milk-based preterm infant formula to human milk as to the rate of NEC. Both trials found that an exclusive human milk diet resulted in a much lower incidence of NEC. While the study noted that cow's milk-based preterm formulas provided consistent calories and were less expensive than human milk-based products, the cow's milk-based products significantly increase the risk of NEC and death. The study also noted the "exponential" health care costs associated with NEC and noted data from the U.S. from 2011-2012 that showed that the cost of NEC is $180,000.00 to $198,000.00 per infant and nearly doubles to $313,000.00 per infant for surgically treated NEC. Further, NEC survivors accrue substantially higher outpatient costs. Jocelyn Shulhan, *et al*,

5

*Current Knowledge of Necrotizing Enterocolitis in Preterm Infants and the Impact of Different Types of Enteral Nutrition Products*, ASN ADV. NUTR., 8(1):80-91 (2017).

13. The WHO's 2018 status report on this issue noted that "despite ample evidence of the benefits of exclusive and continued breastfeeding for children, women, and society, far too few children are breastfed as recommended." The status report states that "a major factor undermining efforts to improve breastfeeding rates is continued and aggressive marketing of breast-milk substitutes," noting that in 2014, the global sales of breast-milk substitutes amounted to US $44.8 billion and "is expected to rise to US $70.6 billion by 2019." *Marketing of Breast-milk Substitutes: Nat'l Implementation of the Int'l Code, Status Report 2018*. Geneva: World Health Org., 2018, p.21.

## II. Marketing Tactics

14. Upon recognizing a shift in the medical community towards an exclusive human milk-based diet for preterm infants, Defendant began heavily promoting "human milk fortifiers," a name which misleadingly suggests that the product is derived from human milk, instead of what it is truly derived from—cow's milk.

15. Defendant has designed systematic, powerful, and misleading marketing campaigns to persuade physicians and parents to believe that: (1) cow's milk-based formula and fortifiers are safe; (2) cow's milk-based products are equal, or even superior, substitutes to breastmilk; and (3) physicians consider its cow's milk-based products a first choice.

16. Similarly, Defendant markets its products for preterm infants as necessary for growth, and perfectly safe for preterm infants, despite knowing of the extreme risks posed by such products and failing to warn of NEC and potential risk of death.

17. Despite the existence of alternative and safe human milk-based fortifiers,

Defendant continues to market and sell cow's milk-based products under the guise of being a safe product for newborns and despite knowing the significant health risk posed by same.

18. Defendant has for decades promoted its product as more healthy and the choice of a modern, sophisticated mother. Its advertisements attempt to portray the idea that breast feeding is the inferior and less sophisticated choice.

19. "Since the late 19th century, infant formula manufacturers have encouraged mothers to substitute formula for breastmilk." Rosenberg KD, Eastham CA, Kasehagen LJ, Sandoval Ap. *Marketing Infant Formula Through Hospitals: The Impact of Commercial Hospital Discharge Packs on Breastfeeding.* Am J. Public Health. 2008; 98(2): 290-295.

20. Further, in 1989, Defendant began advertising that Similac was "first choice of more physicians."

21. A study showed that direct-to-consumer advertising increased the rate of requests for brand choices and the likelihood that medical professionals would prescribe those brands. Parker, R.S., & Pettijohn, C.E. (2003). *Ethical Considerations in the Use of Direct-to-Consumer Advertising and Pharmaceutical Promotions: The Impact on Pharaamceutical Sales and Physicians.* Journal of Business Ethics, 48, 279-290.

22. In 1978, Defendants began marketing Similac as specifically for premature babies and claiming that the product was "introduced to meet the special needs of premature infants." Despite the fact that premature infants are at the highest risk from the dangers of this type of product.

23. Despite the strong medical evidence establishing the dangers posed by cow's milk-based products in premature infants, Defendant used systematic and misleading campaigns stating that: (1) cow milk-formula and fortifier is safe; (2) cow-milk products are equal, or superior to

breastmilk; and (3) Physicians consider its cow's milk-based products a first choice.

### III. Olivia Hammann and the Product

24. Olivia was born on February 2, 1994 at Swedish Medical Center in Englewood, Colorado, extremely premature with a low birth weight of just over one pound, 620 grams, at 27 weeks gestation.

25. Olivia was immediately placed in the Neonatal Intensive Care Unit ("NICU") at Swedish Medical Center.

26. Following the birth of Olivia, Marilu Hammann ("Mother") successfully pumped her own breast milk and produced sufficient supply for her baby's nutrition.

27. On February 9, 1994, Olivia was fed 52 cal/kg/day of breast-milk and *Similac Alimentum*.

28. On February 10, 1994, Olivia was fed 71 cal/kg/day of Alimentum.

29. On February 11, 1994, Olivia was fed 72 cal/kg/day of Alimentum.

30. On February 12, 1994, Olivia was fed 74 cal/kg/day of Alimentum and began a four-day period of feeding intolerance.

31. On February 13, 1994, Olivia was continued on 80 cal/kg/day of Alimentum.

32. On February 14, 1994, Olivia was fed 40cal/kg/day of Alimentum. She began a septic workup of Ampicillin, Claforan, and Vancomycin after cultures showed mixed respiratory flora. The antibiotics continued until February 18, 1994.

33. On February 15, 1994, Olivia was fed 31 cal/kg/day of Alimentum.

34. On February 16, 1994, Olivia was fed 37 cal/kg/day of Alimentum and began experiencing shortness of breath.

35. On February 17, 1994, Olivia was fed 67 cal/kg/day of Alimentum and received a

blood transfusion after showing respiratory distress.

36. On February 18, 1994, Olivia was fed 101 cal/kg/day of Alimentum and underwent another blood transfusion.

37. On February 19, 1994, Olivia was fed 78 cal/kg/day of Alimentum.

38. On February 20, 1994, Olivia was fed 90 cal/kg/day of Alimentum.

39. On February 21, 1994, Olivia was fed 80 cal/kg/day of Alimentum.

40. On February 22, 1994, Olivia was fed 79 cal/kg/day of Alimentum.

41. On February 23, 1994, Olivia was fed 108 cal/kg/day of Alimentum.

42. On February 24, 1994, Olivia was fed 115 cal/kg/day of Alimentum.

43. On February 25, 1994, Olivia was fed 110 cal/kg/day of Alimentum.

44. On February 26, 1994, Olivia was fed 110 cal/kg/day of Alimentum.

45. On February 27, 1994, Olivia was fed 82 cal/kg/day of Alimentum. On such day Olivia experienced an acute event and was placed on Claforan, Clindamycin, and Vancomycin. She also received a blood transfusion, experienced grossly bloody stools.

46. On February 27, 1994, Olivia was diagnosed with NEC and formula feedings ended.

47. On March 1, 1994, Olivia underwent an exploratory laparotomy which found localized transmural necrosis of the small intestine. Olivia experienced postoperative renal failure and showed abdominal distention.

48. On March 2, 1994, Olivia experienced respiratory distress.

49. On March 3, 1994, Olivia died of septic shock, acute renal failure, necrotizing enterocolitis and extreme prematurity.

50. Olivia's growth percentile at the time of her admission was below the 10th

percentile for weight and length and the 25th percentile for head circumference.

51. At the time Olivia was diagnosed with and treated for NEC, Olivia's parents and treaters were unaware of the fact that Defendant's Product caused or substantially contributed to her development of NEC and her death.

### IV. Inadequate Warnings

52. Defendant promotes the use of its preterm infant cow's milk-based products to parents, physicians, hospitals, and medical providers as safe products that are specifically needed by preterm infants for adequate growth.

53. Despite the knowledge of the significant health risks posed to preterm infants, Defendants failed to warn parents and medical providers of the risk of NEC. Further, Defendant failed to provide any instructions or guidance on how to properly use its cow's milk-based products as to lower the risk or avoid NEC completely.

54. Defendant does not provide any warning in its labeling, websites, or marketing that discusses the risk of NEC and death with use of its cow's milk-based products with preterm infants.

55. The warning on Similac Human Milk Fortifier, an Abbott cow's milk-based product specifically marketed for use with preterm infants states:

> **"Precautions**
> - Add only to human milk—do not add water
> - This product is nutritionally incomplete by itself and is designed to be added to human breast milk
> - Additional iron may be necessary
> - Tolerance to enteral feedings should be confirmed by offering small volumes of unfortified human milk
> - Once enteral feeding is well established, Similac Human Milk Fortifier Concentrated Liquid can be added to human milk
> - Not intended for feeding low-birth-weight infants after the reach a weight of 3600 g (approximately 8lbs) or as directed by a physician
>
> **Preparation and Use**

> **Follow directions as specified on carton. Improper dilution may be harmful."**

56. Defendant does not warn users, parents, and/or the medical providers and staff that its cow's milk-based products may cause NEC or death. Nor does Defendant provide any guidance on how to avoid or reduce the risks of NEC or death while using its products.

## V. Fraudulent Concealment

57. Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

58. The running of any statute of limitations has been tolled by reason of Defendant's fraudulent concealment. Defendant, through its affirmative misrepresentations and omissions, actively concealed from Olivia parents and healthcare providers the true risks associated with *Similac* Alimentum.

59. At all relevant times, Defendant has maintained that its Product was safe.

60. As a result of Defendant's actions, Olivia's parents and healthcare providers were unaware, and could not reasonably know or have learned through reasonable diligence that *Similac* Alimentum exposed Olivia to the risks alleged herein and that those risks were the direct and proximate result of Defendant's acts and omissions.

61. Further, Defendant is estopped from relying on any statute of limitations because of its fraudulent concealment of the true character, quality, and nature of its Product because this was non-public information over which Defendant had and continue to have exclusive control, and because Defendant knew that this information was not available to Olivia's parents or to healthcare providers. In addition, Defendant is estopped from relying on any statute of limitations because of their intentional concealment of these facts.

62. Olivia's parents and healthcare providers had no knowledge that Defendant was

engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by Defendant, Olivia's parents nor healthcare providers could have reasonably discovered the wrongdoing any time prior.

63. Additionally, the economics of this fraud should be considered. Defendant had the ability to and did spend enormous amounts of money in furtherance of their purpose of marketing, promoting and/or distributing a profitable infant formula, notwithstanding the known or reasonably known risks. Accordingly, Defendant is precluded by the discovery rule and/or the doctrine of fraudulent concealment from relying upon any statute of limitation.

## COUNT I:
## STRICT LIABILITY AS TO DEFENDANT'S DESIGN

64. Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

65. Prior to February 2, 1994, Defendant was aware, or should have been aware, that its products were not safe for use.

66. Defendant knew or should have known that the use of its cow's milk-based products with preterm infants was unreasonably dangerous in that its cow's milk-based products significantly increased the risk of NEC.

67. At all times material to this action was engaged in the sale, and/or marketing and/or design, and/or manufacture, and/or distribution of cow's milk-based products, which are defectively designed and/or unreasonably dangerous to consumers.

68. Defendants cow's milk-based products manufactured, distributed and/or sold by Defendant, were in a defective and/or unreasonably dangerous condition at the time the products were placed in the stream of commerce for nutritional use for preterm infants.

69. Defendant, as a manufacturer, has a duty to hold the knowledge and skill of an

expert and is obliged to keep abreast of any scientific discoveries and are presumed to know the result of all such advances.

70. Defendant specifically marketed and created its cow's milk-based products for use as nutrition and nutritional supplements for preterm infants.

71. Defendant's cow's milk-based products are expected to and do reach the user without substantial change affecting that defective and/or unreasonably dangerous condition.

72. Furthermore, scientific data and well-researched studies have concluded that Defendant's cow's milk-based products carried unreasonable risks of NEC and death, which far outweighed the products' benefits.

73. Despite the foregoing, Defendant continued to sell and market its defective and/or unreasonably dangerous products to preterm infants.

74. The products were defectively manufactured and/or designed and/or unreasonably dangerous, including, but not limited to the following particulars:

> a. The products did not perform as safely as an ordinary consumer would expect when used in the intended or reasonably foreseeable manner, such that the use of cow's milk-based products as nutrition or nutritional supplements in preterm infants significantly increased the risk of NEC;
>
> b. The products contained hidden and dangerous design defects and were not reasonably safe as intended to be used, subjecting preterm infants to risks of serious bodily injury and or death;
>
> c. The products failed to meet legitimate, commonly held, minimum safety expectations of that product when used in an intended or reasonably foreseeable manner;
>
> d. Defendant failed to utilize economical and technically available safer design alternatives for preterm infant formula and fortifiers;
>
> e. The products were manifestly unreasonable in that the risk of harm so clearly exceeded the products' utility that a reasonable consumer, informed of those risks and utility, would not purchase the product;
>
> f. Defendant failed to adopt an adequate or sufficient quality control program; and/or

  g.  Defendant failed to inspect or test its products with sufficient care.

  75.  As a direct and proximate cause of the cow's milk-based product's unreasonable dangerous condition, Olivia Hammann suffered serious bodily injury and death.

  WHEREFORE, Plaintiff, by and through undersigned counsel, demands judgment against Defendant Abbott Laboratories for all applicable damages, costs of this action, post-judgment interest, and trial by jury.

## COUNT II:
## NEGLIGENCE

  76.  Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

  77.  Despite knowing that its Product significantly increased the risk of NEC in premature infants, Defendant acted negligently in its actions, including, but not limited to, the following:

  a.  Failing to collect data to determine if its products were safe for preterm infants;

  b.  Failing to collect data to determine when and how its products could be used safely;

  c.  Failing to utilize the significant peer reviewed research to develop instructions;

  d.  Failing to develop evidence-based guidelines or instructions to decrease the risk of its products causing NEC;

  e.  Failing to provide evidence-based guidelines or instructions to decrease the risk of its products causing NEC;

  f.  Failing to stop or deter its products from being fed to extremely preterm infants;

  g.  Failing to provide evidence-based instructions or guidance on when or how an extremely preterm infant should be transitioned to the products;

  h.  Failing to continuously and vigorously study its cow's milk-based products in order to avoid NEC in premature infants;

  i.  Failing to utilize economical and technically available safer manufacturing and/or design alternatives for the preterm infant formula and fortifier;

j.  Failing to adopt an adequate or sufficient quality control program; and/or

k.  Failing to inspect or test its products with sufficient care.

78. As a direct and proximate result of Defendant's negligence, Olivia severely suffered during her four weeks alive and consequently died.

WHEREFORE, Plaintiff, by and through undersigned counsel, demands judgment against Defendant Abbott Laboratories for all applicable damages, costs of this action, post-judgment interest, and trial by jury.

## COUNT III:
## FAILURE TO WARN

79. Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

80. Despite Defendant's knowledge that its products were causing NEC and death in premature babies, it did not conduct any testing or research to determine when its product should not be use or how to use its product safely.

81. Defendant did not contact the FDA to inform them that its product was linked to causing NEC and death.

82. Olivia's parents, physicians and medical staff were never informed that the Product could cause the baby to develop NEC.

83. Olivia's parents, physicians and medical staff were never informed that the Product could cause the baby to die.

84. Olivia's parents, physicians and medical staff were never informed of the studies showing that cow's milk-based formula is extremely dangerous to the baby.

85. Olivia's parents, physicians and medical staff were never informed of the studies

portraying human donor milk as a safer alternative to formula.

86. Olivia's parents, physicians and medical staff were never informed of the studies demonstrating an exclusive human milk diet as sufficient to meeting all growth and nutritional goals.

87. Despite knowing its Product caused NEC and death in premature infants, Defendant did not recommend or require hospitals and or physicians to discuss the risk of NEC and/or death with parents.

88. Defendant breached the foregoing duties and failed to provide proper warnings and instructions of its cow's milk-based products, including but not limited to the following acts:

a. Providing no warnings regarding the risk of NEC;

b. Providing inadequate labeling that failed to warn of the risks of use of cow's milk-based products with preterm infants, including but not limited to NEC;

c. Failed to provide proper instructions or guidelines or studies, or data on when and how to feed its products to preterm infants in order to decrease the risk of NEC;

d. Failed to insert a warning or instruction that parents needed to be provided an informed choice between the safety of human milk versus the dangers of the Defendant's cow's milk product;

e. Failed to provide instructions to consumers and health care providers that the Defendant's products carried a significant risk that its cow's milk-based products could cause a Olivia to develop NEC;

f. The warnings and instructions are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct on certain conditions, but do not warn on the use of cow's milk-based products significantly increasing the risk of NEC and fail to provide any details on how to avoid such harm;

g. Failed to contain a large and prominent "black box" type warning that its cow's milk-based products are known to significantly increase the risk of NEC when compared to human milk in preterm infants;

h. Failed to provide well researched and well-established studies that linked its cow's milk-based products to NEC in preterm infants;

i. Failed to cite to or utilize current up-to-date medical data on the proper and safe

        use of its products;

j.      Failed to otherwise warn physicians, and healthcare providers of the extreme risks associated with feeding preterm infants cow's milk-based products;

k.      Failed to send out "Dear Dr." letters warning of the risks of NEC and death and the current scientific research and data to better guide the hospitals and physicians to better care for the extremely preterm infants;

l.      Failed to advise physicians and healthcare providers that cow's milk-based products are not necessary to achieve growth and nutritional targets for preterm infants; and/or

m.      Failed to contain sufficient instructions and warnings on the cow's milk-based products such that health care providers and health care staff were not properly warned of the dangers of NEC with use of cow's milk- based products and preterm infants.

89.      As a direct and proximate result of Defendant's failure to warn, Olivia Hammann suffered serious bodily injury and death.

WHEREFORE, Plaintiff, by and through undersigned counsel, demands judgment against Defendant Abbott Laboratories for all applicable damages, costs of this action, post-judgment interest, and trial by jury.

## COUNT IV:
## SURVIVAL STATUTE

90.      Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

91.      Plaintiff brings this action on behalf of Olivia under provisions of 755 ILCS 5/27-6, the Illinois Survival Statute.

92.      As a direct and proximate result of the foregoing negligent acts and/or omissions of Defendant, Olivia was diagnosed with NEC and died as a result of her consumption of Defendant's product.

93.      Had Defendant herein complied with the FDA requirements, designed an effective

product, and adequately warned, Olivia would not have died of NEC.

WHEREFORE, Plaintiff DAN HAMMANN, individually and as the representative of the estate of Olivia Hammann, deceased asks for judgment to be entered against Defendants, in a sum in excess of the jurisdictional minimum and for such other and further relief as this Court deems just and proper.

## COUNT V:
## WRONGFUL DEATH

94. Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

95. Plaintiff brings this action pursuant to 740 ILCS 180/, et seq., commonly known as the Wrongful Death Act.

96. At all times relevant hereto, Defendants owed a duty to Olivia, Olivia's parents, her physicians and medical staff, to hold the knowledge and skill of an expert and is obliged to keep abreast of any scientific discoveries and are presumed to know the result of all such advances.

97. Defendant breached its duty to Olivia, Olivia's parents, her physicians and medical staff and failing to warn of the risks of NEC and death associated with its product.

98. As a direct and proximate result of the foregoing negligent acts and/or omissions of Defendant, Olivia died from NEC.

99. Had Defendant herein complied with the FDA requirements, designed an effective product, and adequately warned, Olivia would not have died of NEC.

WHEREFORE, Plaintiff, by and through undersigned counsel, demands judgment against Defendant Abbott Laboratories for all applicable damages, costs of this action, post-judgment interest, and trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendant on each of the above-referenced claims and causes of action as follows:

1. Damages for the Wrongful Death of Olivia Hammann pursuant to Illinois Wrongful Death Act, 740 ILCS 180/1;

2. Damages awarded pursuant to the State of Illinois Survival Act, 755 ILCS 5/27-6

3. Awarding compensatory damages in an amount to be proven at trial;

4. Awarding compensatory damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, loss of consortium, and other non-economic losses sustained as a result of Defendant's conduct;

5. Awarding damages for past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

6. Punitive and/or exemplary damages for the wanton, willful, fraudulent, and reckless acts of Defendant who demonstrated a compelte disregard and reckless indifference for the safety and welfare of the general public and to the Plaintiff's decedent in an amount sufficient to punish Defendant and deter future similar conduct, to the extent allowed by applicable law;

7. For pre and post judgment interest as permitted by law;

8. For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

9. For such other and further relief as the Court deems proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all issues and causes of action.

Respectfully Submitted,

*/s/ Ken Moll*

Ken Moll
**MOLL LAW GROUP**
22 West Washington Street, Floor 15
Chicago, Illinois 60602
Tel: (312) 462-1700
Fax: (312) 756-0045
info@molllawgroup.com